AO 91
Rev. 11/82

**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. <br><br> ANA AGUILAR <br> aka Ana Mata, <br> aka Ana Lilian Aguilar Acosta, <br> aka Ana Galvez | FILED DOCKET NO. <br><br> JUN 16  9 39 AM '97 MAGISTRATE'S CASE NO. <br> CLERK U.S. DISTRICT COURT <br> CENTRAL DIST. OF CALIF. <br> BY _____ <br><br> **971361 M** |
|---|---|

Complaint for violation of Title 18, United States Code §§ 1546(a), 1028(a)(4), and 371

| NAME OF MAGISTRATE JUDGE <br><br> CARLA M. WOEHRLE | UNITED STATES MAGISTRATE JUDGE | LOCATION <br><br> Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE <br><br> June 7, 1997 | PLACE OF OFFENSE <br><br> Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about June 7, 1997, in Los Angeles County, within the Central District of California, defendant ANA AGUILAR, aka Ana Mata, aka Ana Lilian Aguilar Acosta, aka Ana Galvez, knowingly and intentionally possessed fraudulently issued INS documents, such as work authorization documents, and birth certificates, and did in fact knowingly possess fraudulently obtained INS documents, in violation of Title 18, United States Code, Sections 371, 1028(a)(4), and 1546(a).

ENTER ON ICMS
JUN 25 1997

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT <br><br> ERICKA E. ROCKWELL |
|---|---|
| | OFFICIAL TITLE <br> Special Agent - INS |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE <br><br> June 13, 1997 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
PJ:dem      REC: DETENTION (Warrant)

A F F I D A V I T

I, Ericka E. Rockwell, being duly sworn, hereby depose and say:

1.    I am a Special Agent ("SA") with the United States Department of Justice Immigration and Naturalization Service ("INS").  I have been employed by the INS since May 14, 1993, in the Los Angeles District Office.  I am currently assigned to the Criminal Fraud Section as a SA.  During my employment, I have received formal training and on-the-job experience in the detection of counterfeit and altered INS documents.  My responsibilities include investigating and enforcing United States Immigration laws and regulations.

2.    This affidavit is made in support an arrest warrant for the individual known as ANA AGUILAR, aka Ana Mata, Ana Lilian Aguilar Acosta, and Ana Galvez ("AGUILAR") for violations of Title 18, United States Code, Section 1546(a), Fraud and Misuse of Visas, Permits, and Other Documents; Title 18, United States Code, Section 1028(a)(4), Possession of Fraudulently Issued Identification Documents; and Title 18, United States Code, Section 371, Conspiracy.  AGUILAR is a Hispanic female, approximately 5'0", 120 pounds, with a small build, she has brown hair and brown eyes.

3.    On March 19, 1997, I received information regarding a fraudulent document scheme from a Cooperating Private Individual ("CPI") in Las Vegas Nevada.  The CPI told me the following:

a.    That Rafael Devora (the CPI's ex-boyfriend), an

illegal alien, had paid CARLOS GALVEZ (Galvez) of El Monte, California $900.00 to help him obtain legal permanent residence in the United States approximately 3 years ago.

b. That Devora, a citizen of Mexico, received a birth certificate stating that he was from El Salvador, and a few months later received an Employment Authorization Card from the INS through CARLOS GALVEZ's office in El Monte, California.

c. That Rafael Devora works at the Stratosphere Hotel in Las Vegas, Nevada, and she knows of several other illegal aliens from Mexico that went to Galvez's office in El Monte, California and received an Employment Authorization Card.

d. The CPI provided me with telephone number (818) 338-1022 for Galvez.

4. On March 24, 1997, I called telephone number (818) 338-1022. A Hispanic female answered. I asked her if this was the number for CARLOS GALVEZ. She replied, "Why do you want to know?" I told her that I wanted to make an appointment with CARLOS GALVEZ and needed the address. She gave me the address of 520 South Glendora Avenue, West Covina, California. She also stated that if I wanted to see "Carlos" that I would have to make the appointment a day in advance.

5. On March 27, 1997, SA Sean P. Kelly of the Immigration and Naturalization Service ("SA Kelly") and I went to the business address of Galvez, 520 South Glendora, West Covina, California, to verify its existence.

6. On March 27, 1997, I went inside the office in an

attempt to corroborate the information furnished by the CPI.

a.    I entered 520 South Glendora Avenue, West Covina, California and asked for Galvez, stating that I did not know his first name and was not sure if I was at the right place because the sign above the front door read C & A Travel.  A Hispanic female (MARIA LNU) responded by asking, "Why do you want to see him?"  I told her I was from Las Vegas, Nevada, and that friends had told me about CARLOS GALVEZ and how he could help me.  MARIA LNU went on to say "Oh, you must be here to buy a work permit."  Again, I asked if I was at the right place.  She responded by saying, "Yes, this is the office of Mr. CARLOS GALVEZ.  We all do the same thing here, please have a seat."  When I tried to sit by the chairs in the waiting area, I was instructed to sit at a chair in front of MARIA LNU's desk to talk about how she could help me get a valid Employment Authorization Card with the INS.

b.    I was told that even though Galvez was not there at the time, she (MARIA LNU) could help me.  MARIA LNU told me that I would be able to apply for a social security card and driver's license until my work permit card arrived in three or four months.

c.    The Employment Authorization Card would be valid and when the case went through, a "green card" would be sent to me.

d.    MARIA LNU told me that there was no need to go to INS for anything, that the "Work Permit Card" would be delivered to their office.

3

e. MARIA LNU told me to return to the office with two photographs and a completed set of fingerprint cards.

f. MARIA LNU explained that their fees are $700.00, $200 down, and $500 when the Employment Authorization Card arrives.

g. MARIA LNU asked me where I was from and I told her Mexico. She told me that when they file forms with Immigration, the "client" assumes a different identity. She also told me that during the period of time that El Salvadorians could apply to INS for political asylum, Carlos had sent in to INS "tons" of files so that they could be opened when needed. I inferred from what she told me that Carlos' open files were "dummy" files opened with phony information. That is why when Carlos would send in information for me, I would have to assume a different identity.

h. MARIA LNU told me that the documents I would receive would have a different name, date of birth, and any other thing Galvez could not match with my own records.

i. In order to convince me that she was telling the truth, MARIA LNU pulled out her wallet and showed me her work permit card, driver's license, and Social Security Card and stated "I just got these two days ago."

j. As I held the cards, I noticed that MARIA's photograph and the name "Veronica" appeared on the cards. MARIA LNU told me that her real name was "MARIA," but Veronica was the name on all her Immigration documents. The Work Permit document appeared to be a genuine computer generated card.

4

k.   I told MARIA LNU that I did not have the down payment of $200.  MARIA LNU told me that there were only a few numbers left and that if I gave her at least $100 to $150 she would start the paperwork.

l.   To reassure me about the validity of the documents, MARIA LNU explained that their office sent many names to the Immigration Service in order to have alien registration files created for people from El Salvador and Guatemala.  Those numbers and identities are given to clients that pay the fee to Galvez and/or his associates.

m.   As I was leaving the office, MARIA LNU asked me to call back and gave me a business card titled, "International Immigration Service" with Galvez's name, address, and telephone number on it.  I asked her what name she should write on the card, MARIA or Veronica.  MARIA LNU responded by saying that "MARIA" would be the correct name to write as no one in the office knows her as Veronica.

n.   While I was in the office on March 27, 1997, approximately eight people came into the office and appeared to be in the process of purchasing permits.  Two men entered the office and came up to the other female working and asked if their "Permisos" (Work Permit Cards) were ready to be picked up.  A second group, two males and a female, entered the office and asked MARIA LNU if "Carlos" was there.  MARIA LNU told them that Galvez was not there and asked if she could help them.  One of the men in the group said "we want to buy a permit."  MARIA LNU

then asked if the card was for a man or a woman.  The man stated that it was for a woman, at which time MARIA LNU pointed to the woman who was with them and asked "Is the card for her?"  The man said yes.  MARIA LNU told the group to have a seat and she would help them as soon as possible.

o.   I left telling MARIA LNU that I would try to get the money together for a down payment.

7.   On April 1, 1997, I conducted a records check of documents filed with the Los Angeles County Clerk's Office in Norwalk, California, for licensing information regarding C&A Travel, aka International Immigration Service, located at 520 South Glendora Avenue, West Covina, California.  I learned that the business located at that address is listed under the name of AGUILAR and is doing business under the name of C&A Travel Services.  Listed on the license form was the home address of 1327 West Mariana Street, West Covina, California 91790, and a mailing address of 9313 California Avenue, South Gate, California 90280.

8.   On April 3, 1997, I ran multiple checks on AGUILAR's name through California DMV records, state and FBI criminal records, and INS alien files and naturalization.  The California DMV records revealed that AGUILAR has a Driver's License number A6743553 with the name of Ana Lilian Mata, two aka's of Ana Litian AGUILAR and Ana Lilian AGUILAR, with the address of 1327 West Mariana Street, West Covina, California.  The DMV records show that AGUILAR has multiple vehicles registered under her name

and Galvez's name, with the address of P.O. Box 107, South Gate, California 90280.  In her alien file number A41445145, the records show that she is a naturalized citizen of the United States with no criminal record and a social security number of 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.  The California DMV records also showed that AGUILAR and Galvez previously resided at 10011 Alpaca Street, South El Monte, California before moving to West Covina.

9.  On April 3, 1997, SA Kelly and I made a consensually monitored phone call to International Immigration Service at (818) 338-1022.

10.  The telephone was answered by GLORIA LNU.  When I asked to speak to MARIA, she told me that MARIA was not there.  I explained to GLORIA LNU that I had been to the office previously and that MARIA told me to call back when I had the money for a down payment.  GLORIA LNU asked me if I was calling to get an initial permit or an extension.  I told her it was an initial permit and that I needed information regarding the two photos and fingerprints previously requested by MARIA LNU.  She put me on hold.  After a minute or so, MARIA LNU answered the phone and I told her that I had the money for a "permiso" (Work Permit). MARIA LNU told me the following:

a.  She stated that the whole process could be done through the mail if I wanted to.

b.  MARIA LNU wanted to know if I was going to mail the money and information to the office or come in person.

c.  She offered to take my picture at their office for

a fee of $10.

d.    She told me not to worry about fingerprints as she would use someone else's fingerprints for my permit.

e.    She told me that I needed to bring the down payment of $200 plus the $10 for the pictures in cash as they did not accept money orders or checks.

f.    I made an appointment for Monday, April 7, 1997, at 11:00 a.m.

11.    On April 7, 1997, SA Kelly and I, along with SA Jeff Cotter and Investigative Assistant ("IA") Loraine Sandoval, conducted an undercover operation at 520 South Glendora Avenue, West Covina, California.  As I entered the office, contact was made with MARIA LNU and GLORIA LNU.  During the operation, the following transpired:

a.    GLORIA LNU asked me where I was from, and I told her San Felipe.  GLORIA LNU then asked where San Felipe was in Mexico and I told her Baja.  GLORIA LNU replied, "Oh, Baja California."

b.    GLORIA LNU told me that MARIA LNU needed my name and date of birth so she could match it with someone else's information.

c.    MARIA LNU asked GLORIA LNU to take my picture in a room within the office;

d.    After receiving the payment of $10 for the photos and $200 as a down payment, MARIA LNU gave me receipt number 345778 showing that I paid $210 for a permit and photos with a

remaining balance of $500, signed by MARIA.

   e.   MARIA LNU wrote her home telephone number (818) 444-8970 on the back of an International Immigration Service business card with the name Evelyn on it.

12.   During the time that I was in the office on April 7, 1997, MARIA LNU and GLORIA LNU were working on making up files for other people.   They were making appointments over the phone to clients and explaining to them how they could get a work permit card.   While they were helping me, they were also answering questions from people who walked in and asked for their cards.   Every person that walked in always asked for "Carlos" first and then was helped by MARIA LNU or GLORIA LNU.   During the phone conversation, they would always tell people to come and see "Carlos" and would explain that the card would be valid but they would just have to use someone else's identity.

13.   A few minutes later, on April 7, 1997, a man walked in the office and went into the back room where my photos were taken earlier.   He made a short phone call.   MARIA LNU walked to the back room holding my file and talked to him for a very short period of time before coming back to help me.   As he left, he told GLORIA LNU and MARIA LNU that he had something to do and would be back in a few minutes.

14.   When the man was in the back room, I asked GLORIA LNU if he was "Carlos."   She told me, "Yes, that's Don Carlos."   I know from training and experience regarding the Spanish language and Mexican culture that the use of the word "Don" before a

9

person's name signifies that he is the person in charge and is an important man.

15.  I asked MARIA LNU to show me her Employment Authorization Card again.  She told me that she could show me someone else's card.  On her desk, MARIA LNU had between seven to ten files.  I asked about the files and she showed me that the client's real name is written on the outside label but inside the file are the forms containing a different name.  She told me that the nationality listed inside the file was usually El Salvadorian even though most of her clients are Mexican citizens.  She opened one of the files and showed me an envelope from the INS.  MARIA LNU opened the envelope and gave me the Employment Authorization Card and the letter in the envelope.  She told me she was trying to get in touch with those people because their permits had just arrived from INS.

16.  On or about April 9, 1997 I went to the West Covina City Hall to review the ownership records of C&A Travel and International Immigration Service which revealed the following:

a.  AGUILAR and Carlos Mata (an alias used by Galvez) are business partners in C&A Travel Service, with the license number of 0022124, which is located at 520 South Glendora Avenue, West Covina, California.

b.  The telephone numbers (818) 338-1022 and (818) 960-4665 are listed in licensing records for C&A Travel.

c.  The home address of AGUILAR and Carlos Mata is 1327 West Mariana Street, West Covina, California.

10

17.    I found no records at the West Covina City Hall pertaining to International Immigration Service.

18.    On or about April 16, 1997, I telephoned Postal Inspector Gary Austin and asked him to make a list of the addressee, addressor and the date of all mail addressed to P.O. Box 107 South Gate, California, and 520 South Glendora Avenue, West Covina, California.

19.    Inspector Austin informed me that P.O. Box number 107, in South Gate, California was under the name of Carlos Siguenza ("Siguenza") and was opened on January 25, 1996 with driver's license number of B4718660.    Inspector Austin informed me that certified mail from the INS addressed to Siguenza, Carlos Galvez (aka Carlos Mata), AGUILAR, and Carl's Immigration Services, was being delivered to that box. The volume and type of mail is about five to six pieces daily.    The mail is addressed to different names, and "they" take it all.

20.    Inspector Austin informed me that 520 South Glendora Avenue, West Covina is a business under the name of C&A Travel Service and Carlos Galvez. The mail volume and type is one to two pieces daily, register/express mail from INS arrives twice a week, and certified mail arrives every two weeks.

21.    Inspector Austin informed me that the descriptions of the individuals picking up the mail are as follows:

a.    Hispanic male, 5'5", between 25-30 years old, slim, about 150 pounds.

b.    Female, 5'2", between 25-30 years old, about 110

pounds. Both of them drive a red Toyota, Bronco Like Vehicle.

　　　　c.　　Two Hispanic females, between 5'2"-5'5", 115-120 pounds in their late 20's-30's.

22. On April 22, 1997, surveillance was conducted on 520 South Glendora Avenue by me and SA Sean Kelly.

23. SA Kelly told me that at approximately 1:56 p.m., on April 22, 1997, SA Kelly saw AGUILAR and Eugenia Aguilar, AGUILAR's mother ("Eugenia"), driving a Toyota Previa van with the license plate number of 3NQT968. AGUILAR stopped the van in front of the office and waited until Galvez came out of the C&A Travel office. Galvez opened the back of a Toyota 4 runner, license number 3RSA410. Galvez retrieved an Immigration work Permit Card and applications for Social Security Cards, and gave AGUILAR the documents.

23. SA Kelly and I followed AGUILAR and Eugenia. At approximately 2:15 p.m. AGUILAR and Eugenia went into the Social Security Office located at the intersection of Almahurst and Hoover Road, in the City of Industry, California.

24. I entered the Social Security Office after them and saw that AGUILAR was filling out applications for Social Security Cards. AGUILAR also had some other forms that looked like birth certification letters from a hospital. Eugenia waited in line and when it was her turn AGUILAR came to the window with all the forms and started speaking to the Social Security employee.

25. At approximately 2:30 p.m., on April 22, 1997, SA Kelly and I followed AGUILAR and Eugenia back to West Covina. At 3:00

p.m. AGUILAR went inside the Bank of America on the West Covina Mall on the West Covina Parkway and Vincent Street.  At 3:18 p.m., SA Kelly and I followed AGUILAR and Eugenia back to 1327 West Mariana Avenue, West Covina, California.

26.  On June 5, 1997, I made a consensually monitored phone call to CARLOS GALVEZ at International Immigration Service at (818) 338-1022.

27.  During the conversation, I said I was a client, and CARLOS GALVEZ stated the following:

a.  He had to close his business in West Covina due to security reasons.  I asked him if the reason was because of Immigration and he replied yes and laughed.

b.  The people who worked for him are no longer in the area.

c.  My "work permit" card was in, he had received it about two days ago and it was ready to be picked up.

d.  He would only be in town until Saturday (June 7, 1997) as he was leaving for Mexico for a month and if I wanted to get my card, I would have to do it tomorrow.

e.  When I asked him if I could get the permit from someone else, he told me that because he had to close the office down, he is the only one issuing the cards and assured me that I will get my permit tomorrow if I showed up with my balance of $500.00.

f.  He wanted me to page him when I was ready to pick up my card.  He stated that because of his trip to Mexico, he is

13

in and out of his house and that the best point of contact is his pager.

28.    On June 6, 1997, at approximately 1:00 p.m., I spoke briefly with GALVEZ during which he said he was not married, because he was divorced.  We agreed to meet at about 3:00 p.m. at his office.

29.    On June 6, 1997 at 3:00 P.M., SA Kelly and I, along with other agents went to 520 South Glendora Avenue, West Covina, California to execute a search warrant on that location and to conduct an undercover operation.  During the undercover operation, I met with CARLOS GALVEZ and the following transpired:

a.    CARLOS GALVEZ arrived in a blue Toyota Pick-up truck, license number 4H24923 at approximately 3:35 p.m.  When he got out of the truck, he was carrying a white envelope. I met him outside his office at which time he gave me an envelope with my undercover name (Erica Hernandez) on it, Post Office Box 2178, San Gabriel, California 91778.  Galvez told me that he was using this Post Office box address because he no longer had an office. Also on the outside of the envelope, there was a notation of "$500" and my pager number (800) 628-8512.  Inside the envelope, there was a work permit card that had my picture on it under a false name, Estela Ramirez, with an alien registration number of A 74 421 782.  Also in the envelope, there was a filled out application for my social security number and a receipt from the Immigration and Naturalization Service.  I gave CARLOS GALVEZ $500.00 for the purchase of the Work Authorization Card.

14

b.   CARLOS GALVEZ opened the door to his office and once inside, I saw that the whole place was completely empty and all the filing cabinets and desks were gone. When I asked what had happened, he stated that Immigration officers came to his office a few weeks ago to ask him questions. He stated that after Immigration was there, he talked to his attorney and that his attorney advised him to remove everything from the office.

c.   He told me that he closed the office and was working by himself out of his house, and that he moved all the files to a safe place.

d.   He stated that he is going to Mexico for a month and will open his office again within six months or so. He stated that in the meantime, he was going to do everything through the mail with a very low profile.

e.   CARLOS GALVEZ stated that he was making $10,000.00 daily with his business and has 3,000 clients with open files.

f.   He stated that he has another P.O. Box number 7393 in Alhambra, were all the mail from INS goes.

g.   He said that the post office box in San Gabriel is for customers to write to him, either to make a payment or request birth certificates and/or work permits. The postal office box in Alhambra is strictly for INS to send the work authorization cards back to him.

30.   After this conversation, we both left the building and CARLOS GALVEZ was immediately arrested by INS SAs who were maintaining stationary surveillance of the site.

15

31. At approximately 2:00 p.m. on June 6, 1997, SAs of the Immigration and Naturalization Service had set up surveillance on CARLOS GALVEZ's residence located at 1327 Mariana Avenue, West Covina, California. While conducting surveillance at that residence, at approximately 3:00 p.m., Agents David Sullivan and Philip Salacup observed CARLOS GALVEZ walk out of his house with documents and envelopes which he transported to the meet site at 520 South Glendora Avenue.

32. On June 6, 1997, incident to the arrest of GALVEZ, SA Sean Kelly seized the following items from CARLOS GALVEZ's blue Toyota pickup truck, license number 4H24923, which were in plain view inside the vehicle:

a. A list on an International Immigration Service letter head of approximately five to six hundred names with notations of dollar amounts appearing beside each name.

b. Five unmailed certified letters that appear to have plastic cards inside.

c. A blank form I-765.

d. A blank International Immigration Service miscellaneous form.

e. A list of names with telephone numbers on it.

33. From 2:00 p.m. on June 6, 1997 until a search warrant was executed at 1:00 a.m. on June 7, 1997, SA Marissa Hernandez and other INS agents continually surveilled the house at AGUILAR and Galvez's residence located at 1327 Mariana Avenue, West Covina, California.

34. At approximately 8:40 p.m. on June 6, 1997, SA Marissa Hernandez observed a tan Toyota Previa van, license plate number 3N2E968 drive into the garage located at 1327 Mariana Avenue. I checked DMV records and learned that this vehicle is registered to CARLOS GALVEZ and AGUILAR.

35. SA Hernandez observed AGUILAR exit the vehicle and go into the house with two children. Moments later, Agent Hernandez observed AGUILAR exit the house, enter the vehicle and start it. Agent Hernandez observed that AGUILAR had something in her hand, but she could not see what it was.

36. SA Hernandez approached AGUILAR and at that point, the garage door closed.

37. SA Hernandez knocked on the door of the residence at 1327 Mariana Avenue and identified herself to two Hispanic females. A few moments later, AGUILAR came to the door and SA Hernandez identified herself again.

38. SA Hernandez told me that she asked AGUILAR for consent to search the residence that she and CARLOS GALVEZ share. AGUILAR asked what Agent Hernandez was looking for, and SA Hernandez informed her that she wanted to search for immigration documents. AGUILAR refused consent to search the residence, and SA Hernandez told her that a search warrant for the residence was being pursued. SA Hernandez also informed AGUILAR that her husband CARLOS GALVEZ had been arrested earlier that day.

39. During execution of the search warrant, I asked AGUILAR whether she was married to CARLOS GALVEZ, and she told me she

was.

40.    SA Hernandez also asked AGUILAR if she had any weapons. AGUILAR told Agent Hernandez that she had a weapon in one of the bedrooms.

41.    On June 7, 1997 a Search Warrant was executed at AGUILAR and Galvez's residence at 1327 West Mariana Street, West Covina, California.

42.    Some of the evidence found in the premises and seized pursuant to the warrant are:

    a.    Office folders with one name on the outside label and a different name inside on immigration documents;

    b.    Tickets to El Salvador for June 7, 1997, for AGUILAR, CARLOS GALVEZ, and their two children;

    c.    Receipts for INS documents;

    d.    A revolver and a box of 38 special bullets;

    e.    Fingerprint cards (with fingerprints);

    f.    Copies of certificates of Naturalization from the INS;

    g.    Applications for Social Security Cards;

    h.    Tax records;

    i.    $1000.00 dollars in cash (ten one hundred dollar bills);

    j.    Medical card, WIC checks: and

    k.    Receipts showing Post Office Boxes 3312 and 3606 in South El Monte.

43.    On June 10, 1997, at approximately 9:45 a.m., SA Louis

18

A. Rodi, with other agents, arrested Carlos Siguenza while he was attempting to retrieve mail from P.O. Box 107, South Gate, California.

44. On June 10, 1997, Carlos Siguenza provided me with written sworn statement which revealed the following regarding AGUILAR:

a. He worked for Galvez and AGUILAR for eight to nine months at an office located in San Gabriel, California and West Covina, California;

b. AGUILAR and Galvez taught him how to make fraudulent Asylum files and keep records of the money received by their office;

c. AGUILAR would prepare the Asylum applications using a word processor;

d. AGUILAR and Galvez had customers from all over California, Texas, Idaho, and Nevada;

e. Galvez and AGUILAR took and picked up mail from P.O. Box 2178, in San Gabriel, California. In addition, he stated that Galvez and AGUILAR received mail at his mail box number 107, in South Gate, California.

f. AGUILAR and Galvez opened the office in West Covina under the name of  C&A Travel as a front.

g. AGUILAR was in charge of the office if Galvez was not there.

h. AGUILAR took care of all the money coming into the office.

45.    On June 12, 1997, at 4:20 p.m., SA Sean Kelly called the South El Monte post office at (818) 443-8995, and spoke with Ruben Zertuche, Postal Clerk in Charge.  After the conversation SA Sean Kelly told me the following:

a.    That Ruben Zertuche has been working for the Post Office for 24 years;

b.    That two other clerks by the names of Somchanh Fanapanya, and Mizutant Sage work with him;

c.    That they all know AGUILAR and Carlos Galvez-Mata;

d.    That AGUILAR opened up a P.O. Box number 3312 on December 6, 1994, with a home address of 10011 Alpaca Street, South El Monte, California, and put Carlos A. Mata as the only other person that could pick up mail at that location.

e.    That P.O. Box 3312 started receiving numerous Certified and First Class mail from INS in Laguna Niguel, California;

f.    That Ruben Zertuche asked AGUILAR what she did for a living, and AGUILAR said she worked Immigration cases;

g.    That on December 21, 1994, AGUILAR came to the Post Office in El Monte and updated the signature card for P.O. Box 3312 (Form 1093) adding the business name of International Immigration Services and signed it AGUILAR.

h.    That both AGUILAR and Galvez became real friendly with the postal clerks, bringing them food and drinks and always talking with them;

i.    That P.O. Box 3312 would receive 10 to 15 pieces

of certified mail a week from INS, and AGUILAR or Galvez would pick the mail up on a regular basis;

j.     That on May 3, 1995, P.O. Box 3606 was opened at the South El Monte post office under the name of Beatrice Vargas AGUILAR with a home address of 10011 Alpaca Street, in South El Monte (same address for P.O. Box 3312, one of the houses owned by AGUILAR and Galvez, and where AGUILAR's mother Eugenia Aguilar lives with several undocumented aliens);

k.     That P.O. Box 3606 Received numerous certified letters and first class mail from the INS on a regular basis, until it was closed in May 27, 1997.

46.    On June 12, 1997, SA Sean Kelly talked to Postal Inspector Gary Austin of the Pasadena Office.  After the conversation, SA Sean Kelly told me the following:

a.     That Inspector Gary Austin had put a mail stop on all P.O. Boxes with AGUILAR's or Galvez's name on the signature Cards (Form 1093).

b.     That Inspector Gary Austin had picked up certified, and first class mail from the INS from P.O. Box 3312 South El Monte, California, 91733, P.O. Box 2178, San Gabriel, California 91778, and P.O. box 7393 Alhambra, California, 91802.

47.    SA Sean Kelly looked and felt the envelopes recovered from these postal boxes, and saw that they were sent from INS in Laguna Niguel, and that the envelopes are the same ones that INS uses to send alien registration and work permit cards to aliens. In addition, SA Kelly, upon feeling the envelopes, could feel

21

what felt like some type of plastic card inside.

48. SA Sean Kelly told me that based on his experience and prior training, and knowledge of how Alien Registration Cards are mailed by INS, he believes that the Certified envelopes contain Alien Registration Cards and/or work authorization cards.

49. Based on my experience and training and the facts set forth in this affidavit, there is probable cause to believe that ANA AGUILAR knowingly and intentionally conspired and agreed to possess fraudulently issued INS documents, such as work authorization documents, and birth certificates, and did in fact possess fraudulently issued INS documents in violation of Title 18, United States Code, Sections 371, 1028(a)(4) and 1546.

ERICKA E. ROCKWELL
Special Agent - INS

Sworn on and subscribed to before
on this 13th day of June 1997.

UNITED STATES MAGISTRATE JUDGE